Ernest SIMMONS, Petitioner,

v.

Jeffrey BEARD, Commissioner, Pennsylvania Department of Corrections; William S. Stickman, III, Superintendent of the State Correctional Institution at Greene; and Robert W. Meyers, Superintendent of the State Correctional Institution at Rockview, Respondents.

Civil Action No. 02–161–J.

United States District Court,
W.D. Pennsylvania.

Feb. 22, 2005.

Robert B. Dunham, Matthew Lawry, Defender Association of Philadelphia, Philadelphia, PA, for Plaintiff.

David J. Kaltenbaugh Office of the District Attorney, Ebensburg, PA, for Defendants.

### OPINION AND ORDER

McLAUGHLIN, District Judge.

On June 4, 1993, a jury empaneled by the Court of Common Pleas for Cambria County, Pennsylvania, convicted Petitioner Ernest Simmons of robbery and first-degree murder in the death of eighty-year-old Anna Knaze. The following day, the jury sentenced him to death on his first-degree murder conviction.[1] At issue today is Simmons's Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254. (Doc. 10).

---

1. The trial court sentenced Simmons to a consecutive sentence of ten to twenty years imprisonment on his robbery conviction.

Having reviewed the Petition, we find a consistent pattern of prosecutorial misconduct in the nature of withholding favorable evidence that could have been used to substantially impeach the testimony of the most pivotal prosecution witnesses. We also find that additional suppressed evidence could have been used to further weaken the prosecution's case. Because the long-suppressed information would have affected the trial in such a way as to undermine the Court's confidence in the jury's verdict, Simmons is entitled to a new trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke,* 540 U.S. 668, 675–76, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004).

## I. FACTUAL AND PROCEDURAL HISTORY

At approximately 5:00 p.m. on May 6, 1992, Stephen Knaze discovered the body of his mother, Anna Knaze, lying dead on the floor in her home. (6/1/93 Trial Tr.[2] at 61). Her purse was missing, and was never found. An autopsy performed by Dr. Vimal Mittal at approximately 10:00 a.m. on May 7, 1992, showed that: (1) Knaze had been manually strangled; (2) her spine was severed as a result of her back being hit either by a hard object or by blunt trauma possibly caused by a human fist; and (3) all of her ribs had been broken. (6/2/93 Trial Tr. at 18–20). Dr. Mittal ruled Knaze's death a homicide and listed the cause of death as manual strangulation causing asphyxia. (*Id.* at 28). He estimated that her death occurred between approximately 11:00 a.m. and 2:00 p.m. on

May 5, 1992. (*Id.* at 31–34; 6/4/93 Trial Tr. at 45).

Almost immediately, Simmons became a suspect in the crimes. On May 14, 1992, the police picked him up on an unrelated parole violation and incarcerated him in the Cambria County Jail. He remained incarcerated there and then at the State Correctional Institution ("SCI") at Cresson. On August 19, 1992, while he was still incarcerated for the parole violation, he was charged with the murder and robbery of Anna Knaze.

Simmons's trial commenced on June 1, 1993. It was presided over by the Honorable Thomas A. Swope, Jr. Kenneth Sottile, Esq., and Michael Filia, Esq., of the Cambria County Public Defender's Office, represented him. Linda Fleming, Esq., also of the Public Defender's Office, joined them in representing him during the penalty phase of the trial.

### The Prosecution's Case

The prosecution's key witness at the trial was Margaret Cobaugh. To appreciate Cobaugh's importance to the prosecution's case, one needs to understand the manner in which it presented the case to the jury. It portrayed Simmons as a criminal who preyed upon the elderly. It argued that he "steals, and he robs, and he kills" them. (6/4/93 Trial Tr. at 88). Eighty-year-old Anna Knaze fell victim to Simmons, it contended. But Cobaugh, age sixty-one, had survived a separate attack. And through her testimony, it assured the jury in its opening statement, Cobaugh would provide evidence that would prove that Simmons murdered Knaze. (6/1/93 Trial Tr. at 16–17).

Cobaugh lived on Figg Street, which is located just a few blocks away from

2. All Volume ("Vol.") citations are to the state court record, submitted in Vols. 1 through 27. Simmons's trial was conducted on June 1

through 5, 1993. The trial transcript for June 1, 2, 4 and 5 is contained at Vol. 5. The trial transcript for June 3 is contained at Vol. 6.

Knaze's Maple Avenue home. At trial, Cobaugh testified that during the early morning hours of May 6, 1992, she was walking home from a neighbor's house when she was attacked by a man who reeked of alcohol and who attempted, unsuccessfully, to anally and vaginally rape her.[3] (6/3/93 Trial Tr. at 109–20). She identified Simmons as her attacker. (*Id.* at 120, 123). Most important, she testified that he threatened her during the attack: "If you open your motherfucking mouth, you'll get the same thing Anna Knaze got." (*Id.* at 117). At that time, Cobaugh explained, Knaze's body had not yet been discovered, and she did not understand the threat. (*Id.* at 127).

In its closing argument, the prosecution focused on the importance of Cobaugh's testimony. The threat that Simmons allegedly made to Cobaugh "is so significant" to the Knaze murder, it explained, because at the time of Cobaugh's alleged attack "[t]here was only one person who knew that Anna Knaze was dead. The killer[.]" (6/4/93 Trial Tr. at 100).

LaCherie Pletcher, Simmons's live-in girlfriend at the time of the Knaze murder, provided powerful circumstantial support for the prosecution's theory. Through Pletcher's testimony, it was able to demonstrate that it was possible that Simmons attacked Cobaugh because he was not at home during the early morning hours of May 6, 1992—the time period in which Cobaugh's alleged attacked occurred. (6/2/93 Trial Tr. at 133–34, 138, 156; 6/4/93 Trial Tr. at 90). Pletcher also testified that when Simmons eventually did arrive home, he was drunk, thereby corroborating Cobaugh's testimony that her attacker reeked of alcohol. (*Id.* at 133–34, 156; 6/3/93 Trial Tr. at 118–20).

In addition, Pletcher testified that in mid-April 1992, she found a photo driver's license of an elderly woman living on Figg Street in Simmons's wallet. (6/3/93 Trial Tr. at 177). After viewing Cobaugh's then-current driver's license during the trial,[4] she testified that she believed that the license she found in Simmons's wallet had been Cobaugh's. (*Id.*) The prosecution also introduced evidence to establish that, in April 1992, Cobaugh's purse had been reported missing from the senior activities center where she worked, and that among the items stolen was her photo driver's license. Two employees from the center testified that sometime before Cobaugh's purse was reported missing, Simmons had visited the center asking if he could volunteer there. (6/3/93 Trial Tr. at 89–95). The prosecution contended that its witnesses' testimony established that Simmons stole Cobaugh's purse. It then suggested to the jury that, because Simmons had Cobaugh's license, he knew where she lived and was able to target her for attack. (6/4/93 Trial Tr. at 88, 97).

In addition to the alleged incriminating statement Simmons made to Cobaugh, the prosecution introduced testimony that placed Simmons outside of Knaze's home at around the time the murder could have occurred. Thelma Blough, Knaze's next-door neighbor, her son Gary, and his girlfriend, Tammy Ickes, each testified that they observed Knaze speaking with a black male between 11:00 a.m. and 11:30 a.m. on May 5, 1992. (6/2/93 Trial Tr. at 176–78; 6/3/93 Trial Tr. at 5, 22–23, 43). Each testified that they overheard the black male ask Knaze if he could use her phone because his car had broken down. (*Id.* at 176; 6/3/93 Trial Tr. at 5, 43). Each iden-

---

3. In October 1992, Simmons was charged with the sexual assault of Cobaugh. At the time of the Knaze trial, he had not yet been tried for the crime.

4. The license that Pletcher allegedly found in Simmons's wallet was never located by investigators. (Doc. 10 at 6 n. 8).

tified Simmons as the man they saw speaking with Knaze. (*Id.* at 178–79; 6/3/93 Trial Tr. at 8, 47).

Finally, through the testimony of Pletcher and Simmons's acquaintance, Kitty McKinney, the prosecution was able to establish a forty-five minute window of time the morning of May 5, 1992, during which Simmons's whereabouts could not be independently established. McKinney testified that Simmons gave her a ride that morning and dropped her off at a gas station around 10:30 a.m. (*Id.* at 162–63). She observed that he drove towards the Woodvale section of Johnstown, which is where Knaze resided. (*Id.* at 164, 167–69). Pletcher testified that Simmons picked her up at the Cambria County Domestic Relations Office at 11:45 a.m. (*Id.* at 128–31). The prosecution contended that Simmons murdered Knaze during the unaccounted for period of time between 10:30 a.m. and 11:45 a.m. (6/4/93 Trial Tr. at 89–90).

### Simmons's Defense

The defense's main strategy was to undermine the credibility of each of the Commonwealth's material witnesses. First, it attempted to discredit Cobaugh's identification of Simmons and the link between her alleged sexual assault and the Knaze murder. During Cobaugh's testimony, it was revealed that she first reported her alleged assault around 9:30 a.m. on May 6, 1992, to Johnstown Police Officer Yvonne Krug. (6/3/93 Trial Tr. at 124–27, 165–69;

Officer Krug's Report, Vol. 13). Cobaugh admitted that in her statement to Officer Krug, she did not report the threat that her alleged attacker had made to her regarding Knaze. (*Id.* at 127). In fact, the defense established, Cobaugh did not report the threat or any other link between her case and the Knaze crimes until more than five months later, when, on October 9, 1992, Detective Richard Rok, the chief investigator in the Knaze case, first interviewed her. (*Id.* at 129, 132–33, 142–43; Det. Rok's Report, Vol. 13, Pet.'s Ex. 2).

Cobaugh's October 1992 interview with Det. Rok was also the first time she identified Simmons as her attacker. (*Id.*) Prior to that, she could not provide the police with information to identify the man that allegedly assaulted her. She admitted that she told Officer Krug in May 1992 that she "did not get a good look at the suspect to see his face[.]"[5] (*Id.* at 168–69). Of course, Cobaugh acknowledged, by the time she gave her statement to Det. Rok, she had seen Simmons's picture in the new media identified as the defendant in the Knaze murder case. (*Id.* at 159–62). She explained her delay in identifying Simmons and in reporting the connection between her alleged attack and the Knaze murder by stating that she "blocked the memory of that night out" because she was "afraid for [her] life." (*Id.* at 127).

In closing argument, defense counsel seized upon the significant changes that

**5.** After Officer Krug filed her report of Cobaugh's alleged sexual assault, the investigation of that case apparently remained dormant until Det. Rok assumed responsibility for it. The defense would remain unaware of Officer Krug's Report until the prosecution disclosed it three days before the start of trial. This disclosure took place on Friday during jury selection in Erie County. Upon returning to Cambria County for the trial, defense counsel was unable to subpoena Officer Krug to testify at trial because the officer was on vacation. (*See* 8/26/93 Tr. at 14, Vol. 6).

Simmons maintains that as a result of the prosecution's last-minute disclosure, the defense was not able to effectively impeach Cobaugh with Officer Krug's Report because the trial court did not permit the defense to admit it into evidence because the officer was not available to authenticate it. (6/4/93 Trial Tr. at 22–28). Simmons challenged that ruling on direct appeal. The Supreme Court of Pennsylvania held that even if the trial court erred in excluding the report, the error was harmless. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 638 (1995).

occurred in Cobaugh's account between May 6 and October 9, 1992. He urged the jury to discredit her assertion that she had suppressed the memories of her alleged sexual assault. Instead, defense counsel suggested that Det. Rok's questioning, the media coverage of Knaze's murder, and her own desire to see the killer of her friend meet justice, unduly influenced Cobaugh to change the account of her alleged assault in a manner that would be favorable to the Knaze prosecution's case against Simmons. (6/4/93 Trial Tr. at 51–52, 55, 69–74, 76).

The defense also sought to discredit LaCherie Pletcher's testimony. Pletcher testified that Simmons came home "late" the night of May 5, 1992, and that he may not have come home until "the hours after midnight[.]" (6/2/93 Trial Tr. at 134). She also testified that he was so drunk that he fell to the floor. (*Id.* at 133–35). On cross-examination, defense counsel confronted Pletcher with: (1) sworn testimony that she gave at the August 18, 1992, Coroner's Inquest; and, (2) a statement that she gave to Det. Rok on August 11, 1992. On each occasion, she stated that Simmons came home at 10:00 p.m. the night of May 5, 1992, and that he stayed home with her the rest of the night. (*Id.* at 140–44; *see also* 8/11/92 Stmnt. of L. Pletcher, Vol. 14). She also testified at the Coroner's Inquest that he did not act unusual. (*Id.*) If her prior testimony and police statement were true, then Simmons could not have been Cobaugh's alleged attacker, because Cobaugh claimed that her attack occurred around 12:30 a.m. to 1:30 a.m. the morning of May 6, 1992. (6/3/93 Tr. at 126; *id.* at 83; *see also* Officer Krug's Report at 2, Vol. 13; Det. Rok's Report at 1, 3, Vol. 13, Pet.'s Ex. 2).

When asked by defense counsel to explain why her recollection changed be-

tween August 1992 and the June 1993 trial, Pletcher stated that a letter that she had received from Simmons refreshed her recollection as to the correct timing of events.[6] (*Id.* at 140–42, 156). In its closing argument, defense counsel suggested that Pletcher's testimony changed at trial in order to accommodate the prosecution's theory that Simmons was Cobaugh's attacker. Importantly, this theory had not originated until October 1992, after Cobaugh gave her statement to Det. Rok and for the first time identified Simmons as her attacker and linked her crime to the Knaze crimes. (6/4/93 Trial Tr. at 75).

The defense also raised credibility issues with regard to Thelma Blough's, her son Gary's, and Tammy Ickes's identification of Simmons. It demonstrated that none of them were able to identify Simmons until well after the police first interviewed Knaze's neighbors following the discovery of her body. When Tammy Ickes was first interviewed by the police, she stated that she only had "a quick look," of "a little less than a minute" of the man she saw speaking with Knaze. (6/3/93 Trial Tr. at 10–11). Moreover, neither she nor Thelma Blough was able to identify Simmons's picture from a mug book reviewed on May 7, 1992. (6/2/93 Trial Tr. at 78–79, 194–95). On May 12, Det. Rok showed each woman an array containing six photographs, including Simmons's. (*Id.* at 80–81, 194–95). Once again, neither woman was able to identify Simmons as the man she saw speaking with Knaze. (*Id.*) In his notes from that date, Det. Rok wrote: "Both [Thelma Blough and Tammy Ickes] were shown pictures. Both stated they would not be able to identify the person because it was hard for them to remember." (*Id.* at 82).

---

6. The letter that Pletcher referenced is dated May 23, 1992. (5/23/92 letter, Vol. 11). In it

Simmons listed his alleged whereabouts during specific time periods on May 5, 1992.

It was not until a couple weeks later, in June 1992, that investigators were able to secure an identification of Simmons that placed him at Knaze's home the day of the crimes. Around the end of May 1992, Thelma Blough called Det. Rok and informed him that her son, Gary, could make a positive identification of the man that he saw speaking with Knaze the morning of her murder. (6/2/93 Trial Tr. at 83–84; 6/3/93 Trial Tr. at 45–47). At that time she made the call, Gary was incarcerated in the same jail as Simmons. (6/3/93 Trial Tr. at 47). Like Simmons, Gary Blough had been jailed following the Knaze murder for an unrelated parole violation. (*Id.*)

Thelma Blough's call to Det. Rok was the first time the police were informed that Gary Blough was even at his mother's home the day of the murder. (6/2/93 Trial Tr. at 83–84). Gary Blough testified that he did not immediately inform the police that he was at his mother's home on May 5 because the police were looking for him at the time for the parole violation. (6/3/93 Trial Tr. at 45–47, 62). He admitted on cross-examination that when he was eventually jailed for his parole violation on May 18, he quickly learned that his fellow inmate Simmons was a suspect in the Knaze murder. (*Id.* at 57–60). He soon thereafter had his mother call the police and tell them that he had information relevant to the Knaze murder investigation. (*Id.* at 44). Det. Rok visited him in prison on June 8, 1992, and he identified Simmons. (6/2/93 Trial Tr. at 83).

Tammy Ickes was not able to identify Simmons until after she visited Gary Blough in prison and he pointed out Simmons to her as the suspect in the Knaze murder case. (6/3/93 Trial Tr. at 31–32, 38). And, Thelma Blough did not identify Simmons until the preliminary hearing on September 2, 1992. By that point in time, she admitted, she had seen his picture in the news. (6/2/93 Trial Tr. at 197–98).

\* \* \*

On June 4, 1993, the jury convicted Simmons of first-degree murder and robbery. (6/4/93 Trial Tr. at 135). The next day, after a separate penalty hearing, the jury sentenced him to death. (6/5/93 Trial Tr. at 73).

Simmons was never tried for the alleged sexual assault of Cobaugh. Sometime after the Knaze murder trial, the Commonwealth dropped the charge it had filed against him for that crime.

### Post–Trial Proceedings

On July 19, 1995, the Supreme Court of Pennsylvania affirmed on direct appeal Simmons's convictions and sentences. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621 (1995) ("*Simmons 1*"). The Supreme Court of the United States denied certiorari on February 20, 1996, *Simmons v. Pennsylvania,* 516 U.S. 1128, 116 S.Ct. 945, 133 L.Ed.2d 870 (1996).

On April 12, 1996, Simmons filed a *pro se* petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 PA. CONS.STAT.ANN. §§ 9541 *et seq.* (Vol. 6). Thereafter, the PCRA court, presided over by Judge Swope, appointed counsel to represent Simmons. Evidentiary hearings were conducted on January 14–15, 1998, March 10–11, 1998, April 13, 1998, and September 10, 1998.[7]

On January 26, 1999, the PCRA court issued a decision denying PCRA relief. (PCRA Op., Vol. 6). Simmons appealed to the Supreme Court of Pennsylvania. On December 31, 2001, a fractured court de-

---

7. The transcript of the January 14, 1998, PCRA hearing is contained in Vol. 7. The transcripts of the January 15 and March 10–11, 1998, hearings are contained in Vol. 12.

The transcript of the April 13, 1998, hearing is contained at Vol. 15. The transcript of the September 10, 1998, hearing is contained at Vol. 17.

nied Simmons relief. *Commonwealth v. Simmons*, 569 Pa. 405, 804 A.2d 625 (2002) ("*Simmons 2* "). Two justices, Chief Justice Flaherty and Justice Newman, joined in the "Opinion Announcing the Judgment of the Court." *Id.* at 631–41. Justice Castille and Justice Nigro concurred in the result. *Id.* at 641. Justice Cappy, now Chief–Justice, concurred in the result on the basis of his prior concurring opinion in *Commonwealth v. Lambert*, 568 Pa. 346, 797 A.2d 232 (2001). Justice Saylor and Justice Zappala filed a dissenting opinion, stating that Simmons was entitled to a new trial because the prosecution had suppressed material evidence and its actions "creates a cloud upon the reliability of the verdict and judgment of sentence." *Simmons 2*, 804 A.2d at 643.

After the Pennsylvania Supreme Court denied PCRA relief, Simmons filed the instant Petition for Writ of Habeas Corpus with this Court. (Doc. 10). Thereafter, he filed a Memorandum of Law in Support of Petition for Writ of Habeas Corpus (doc. 17); Respondents filed their Answer (doc. 19); Simmons filed a Reply (doc. 22); and this Court conducted oral argument on January 30, 2004. (*See* Doc. 29).

On January 25, 2004, five days before the scheduled argument, the PITTSBURGH POST-GAZETTE published an article about this case entitled: *Is death row convict guilty of killing Johnstown woman?* (Doc. 28, Ex. A). The article was authored by Nathan Crabbe and Jamie Keaney of the Innocence Institute of Western Pennsylvania ("the Institute") under the supervision of POST-GAZETTE staff writer and Institute Director Bill Moushey. (*Id.*) The authors interviewed Cobaugh for the article and reported that she admitted to them that, at the direction of Det. Rok, she had lied at the Knaze trial when she identified

Simmons as her alleged attacker. The article states:

> Cobaugh, now 73, said she named Simmons because Rok "was positive that Ernest Simmons did it but he had no proof of it. . . . . He didn't have a witness."
>
> She said she told Rok she "could not positively identify anyone," but he continued to interrogate her. "I think Detective Rok wanted a conviction more than anything. He wanted Ernie Simmons bad," she said.
>
> She finally agreed to identify Simmons as her attacker—even though she now admits she never saw the man's face. (*Id.*, Ex. A).[8]

Following publication of the article, Simmons moved to amend the Petition to include factual and legal claims derived from Cobaugh's recent interview with the Institute reporters. (*Id.*) At the conclusion of oral argument held on the motion to amend (doc. 35), the Court denied the motion. (Doc. 35 at 22–26). We concluded that because the newly-discovered factual allegations that he sought to amend to his Petition where demonstrably distinct from any facts presented in the Petition, any claims based upon those allegations first had to be exhausted before the state courts. (*Id.* at 23 (citing *Landano v. Rafferty*, 897 F.2d 661, 669 (3d Cir.1990))). Because Simmons was still within the sixty-day time limit for raising PCRA claims based upon newly-discovered factual allegations, 42 PA.CONS.STAT. § 9545(b), we further held that we could not conclude that requiring him to exhaust his new claims would be futile. (*Id.* at 24–25 (citing *Lines v. Larkins*, 208 F.3d 153, 163 (3d Cir. 2000))); *see also id.* at 13 (Respondents admit Simmons within sixty-day PCRA limitations period). Accordingly, the Court issued an order staying these pro-

---

8. At the time the article was published, Det. Rok was serving a one-year federal prison

sentence in Missouri for assaulting a handcuffed suspect.

ceedings and directing Simmons to file a timely action in state court in order to exhaust his state court remedies. (*Id.* at 25–26).

On March 24, 2004, Simmons filed a motion to lift the stay. (Doc. 36). He asserted his innocence and stated that "[r]eturing to state court would surely entail additional delay in the resolution of Petitioner's pending claims." (*Id.* ¶ 8). Because he and his counsel agreed that his "pending claims are already strong and themselves require relief[,]" Simmons "decided not to pursue the option of returning to state court to file a successor PCRA petition based on the new information[,]" and requested that the stay be lifted and that the Court consider the merits of the Petition. (*Id.* ¶ 8–9). On March 25, 2004, the Court lifted the stay. (Doc. 37).

## II. PRELIMINARY MATTERS

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132 § 104, 110 Stat. 1214, applies to this case. *Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). It provides, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lambert v. Blackwell,* 387 F.3d 210, 234–36 (3d Cir.2004).

■ As the introductory sentence of § 2254(d) makes explicit, the standard of review set forth therein applies to only those claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Rompilla v. Horn,* 355 F.3d 233, 243 (3d Cir.) (internal quotations and citations omitted), *cert. granted, Rompilla v. Beard,* — U.S. ——, 125 S.Ct. 27, 159 L.Ed.2d 857 (2004). In cases where a claim has not been "adjudicated on the merits," federal courts apply pre-AEDPA *de novo* review. *See e.g., Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001).

Simmons presented all of the claims at issue today during the PCRA proceedings. (Vol. 18, Item 240; Vol. 27; Doc. 19 at 3–4). The PCRA court denied the claims on the merits. (PCRA Op., Vol. 6). Upon review of that decision in *Simmons 2,* five Justices agreed on the result: to affirm. However, no opinion was issued that garnered majority support. Simmons contends that due to the fractured nature of *Simmons 2,* § 2254(d) does not apply. At the same time, he acknowledges that the effect of the five-Justice decision to affirm amounts to a merits review. (Doc. 22 at 6); *Wright v. Sec'y for the Dep't of Corr.,* 278 F.3d 1245, 1254–56 (11th Cir.2002) (cited with approval in *Rompilla,* 355 F.3d at 248) ("In § 2254(d) Congress meant to, and did, mandate deference to state court adjudications on the merits of federal constitutional issues, and a decision that does not rest on procedural grounds, alone is an adjudication on the merits regardless of the form in which it is expressed.")

■ Under the circumstances presented, the Court concludes that § 2254(d) applies. The Court of Appeal for the Third Circuit has instructed that state courts do not have to issue a legal opinion in order for § 2254(d) to apply to the state court's decision. *Rompilla,* 355 F.3d at 247–48 ("For purposes of [§ 2254(d) ], a failure to decide affects the standard of review; a failure to discuss (either at all or to the satisfaction of the habeas petitioner or to the federal court) is irrelevant.") (citing *Weeks v. Angelone,* 528 U.S. 225, 237, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000)); *Chadwick v. Janecka,* 312 F.3d 597, 605–07 (3d Cir.2002).[9] As the Court of Appeals for the Eleventh Circuit explained in the context of a summary state court disposition:

A judicial decision and a judicial opinion are not the same thing. The chief responsibility of judges is to decide the case before them. They may, or may not, attempt to explain the decision in an opinion. The text of § 2254(d)(1) accepts this orthodox view.... The statutory language focuses on the result, not on the reasoning that led to the result, and nothing in that language requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale.... Accordingly, all that is required is a rejection of the claim on the merits, not an explanation.... Telling state courts when and how to write opinions to accompany their decisions is no way to promote comity. Requiring state courts to put forward rationales for their decisions so that federal courts can examine their thinking smacks of a "grading papers"

approach that is outmoded in the post-AEDPA era. *See Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997) (rejecting the approach to § 2254(d)(1) that would have federal habeas courts judge the quality of the state courts' reasoning, because such an approach "would place the federal court in just the kind of tutelary relation to the state courts that the recent amendments are designed to end").

*Wright,* 278 F.3d at 1254–55 (11th Cir. 2002).

In this case, the Court shall review the state court's decision in the same manner that we would review a summary disposition of a claim. When a state court rejects a petitioner's claim without providing an explanation, a federal court must conduct "an independent examination of the record and the clearly established Supreme Court law," but confine its review "to whether the state court's determination resulted in a decision that involved an unreasonable application of[ ] clearly established Federal law." *Bell v. Jarvis,* 236 F.3d 149, 158 (4th Cir.2000) (cited with approval in *Rompilla,* 355 F.3d at 248).

**B. Simmons's Claims Are Not Procedurally Defaulted**

■ Respondents contend that most of Simmons's claims are procedurally defaulted because Chief Justice Flaherty and Justice Newman opined that relief should be denied on the claims due to "briefing deficiencies," *i.e.* failure to properly "contextualize" the claims in the circumstances of the case.[10] (Doc. 19 at 5); *see Simmons 2,* 804 A.2d at 631–34. This defense is with-

**9.** If the state court misconstrues the federal claim, *see e.g., Appel,* 250 F.3d at 209–12, or "if an examination of a state court opinion [otherwise] reveals that the state court did not decide a federal claim on the merits," then § 2254(d) does not apply. *Rompilla,* 355 F.3d at 247–48; *Chadwick,* 312 F.3d at 605–

07; *see also Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *but see Jacobs v. Horn,* 395 F.3d 92, 110 (3d Cir.2005) (applying pre-AEDPA review when the state court did not discuss a claim).

**10.** The two-Justice Opinion Announcing the Judgment of the Court set out rules of appel-

out merit. Only Chief Justice Flaherty and Justice Newman joined in the reasoning of the Opinion Announcing the Judgment of the Court. The remaining Justices that voted for affirmance concurred only on the result reached. Accordingly, the two-Justice opinion did not represent the decision of the majority in *Simmons 2*. *See Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67, 75 n. 3 (1975) (opinion that does not represent the views of the majority is "not decisional."); *cf. Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (holding that a "procedural default does not bar consideration of a federal claim … unless the last state court rendering a judgment in the case *clearly and expressly states that is judgment rests on a procedural bar*." (internal quotations and citations omitted) (emphasis added)).

■ Moreover, the "contextualization" rule relied upon by the two-Justice opinion is not an adequate bar to federal habeas merits review. A petitioner may be barred from federal habeas relief for a "procedural default" only when a state court has denied his claim based upon a state procedural rule that is both "independent" and "adequate." *Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Doctor v. Walters*, 96 F.3d 675, 683 (3d Cir.1996). A state procedural rule is "adequate" only if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred. *Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)). At oral argument, Respondents admitted that the "contextualization" rule applied by the two-Justice opinion was not "firmly established and regularly followed" at the time Simmons filed his brief in *Simmons 2* in September 1999. (Doc. 29 at 21; *see also* doc. 22 at 8–12).

## III. GUILT–PHASE CLAIMS

### A. Prosecutorial Misconduct

In his Petition, Simmons claims that the prosecution violated his due process rights when it suppressed the following information: (1) that to avoid threatened prosecution for . the Knaze crimes, LaCherie Pletcher agreed to cooperate in securing undercover surveillance of Simmons; (2) its involvement in the favorable disposition of gun charges against Margaret Cobaugh and its retention of documents establishing that she had committed perjury in her purchase of the weapon; (3) laboratory test reports related to the alleged sexual assault of Cobaugh, which showed that there was no physical evidence linking Simmons to that crime; and (4) evidence that Cobaugh failed to identify Simmons from a mug book.[11]

#### *Factual Background*

**1. LaCherie Pletcher's Agreement to Participate In the Surveillance of Simmons In Order to Avoid the Threat of Prosecution For the Knaze Crimes**

On November 23, 1992, more than six months prior to trial, Simmons served dis-

late advocacy that counsel must follow in order to be entitled to PCRA review. Prominent among them was the requirement that each claim must set forth in detail all of the requirements for PCRA relief regarding that claim and contain detailed argument regarding each requirement, and the rule that a PCRA petitioner "may not rely on statements made in any other section of his brief as partially or fully meeting the requirements of the claim at issue." *Simmons 2*, 804 A.2d at 631–32 & 632 n. 2. The two Justices then found that Simmons failed to comply with the requirements set forth therein on several of the claims at issue today. (*Id.* at 633–34).

11. These are Claims I, III, IV, and V in the Petition.

covery upon the prosecution, requesting: "The transcripts and recordings of any electronic surveillance, and the authority by which said transcripts and recordings were obtained." (Vol. 14, Pet.'s Ex. 14 at ¶ 1(f)). The prosecution provided no documents in response to this request, nor did it otherwise indicate that any electronic surveillance had been conducted in this case.

LaCherie Pletcher testified at the April 13, 1998, PCRA hearing. She stated that, after Simmons had been arrested, Det. Rok came to her home and took her and her two-year-old daughter to the police station. (4/13/98 Tr. at 7–9). While there, Det. Rok told her that she was a suspect in the Knaze murder case. (*Id.*) He "fingerprinted [her] and took photos of [her.]" (*Id.* at 7) He then requested that she assist the police in their investigation of Simmons. (*Id.* at 10–11).

Pletcher testified that Det. Rok "threatened to put [her] in jail if I didn't cooperate." (*Id.* at 26). She explained that she agreed to participate in the surveillance of Simmons because she was "scared of Detective Rok," and believed he would attempt to "pin something" on her. (*Id.* at 12–13). She also explained that Det. Rok's threats made her fear for her daughter's welfare. (*Id.*)

On at least two occasions, discussed in more detail below, Pletcher allowed investigators to record her conversation with Simmons. Prior to her conversations with Simmons, Det. Rok instructed Pletcher to ask Simmons about his involvement in the Knaze crimes, his alibi for the crimes, and about the driver's license she had found in his wallet in April 1992. (*Id.* at 11; 3/10/98 Tr. at 65). She followed his instructions, and attempted to illicit incriminating statements from Simmons. (*See* Vol. 17, PCRA Joint Ex. 1A).

Pletcher never told anyone about her involvement in the Knaze investigation because she "was scared to." (4/13/98 Tr. at 15–16).

## 2. The Knaze Prosecutor's Involvement In Favorably Disposing of State Gun Charges Against Margaret Cobaugh and Its Retention of Documents Establishing That She Had Committed Perjury In Her Application for the Gun

On May 8, 1992, two days after her alleged sexual assault, Margaret Cobaugh purchased a semi-automatic pistol. (Vol. 13, Pet.'s Ex. 7). During the required criminal background check, the Pennsylvania State Police discovered that she had been convicted of burglary in Somerset County in 1951 and sentenced to fifteen to twenty years confinement. (3/10/98 Tr. at 85, 141–42). Under the Pennsylvania Uniform Firearms Act ("PUFA"), it is illegal for a convicted felon to purchase a firearm. 18 Pa.Cons.Stat. § 6105(a)(1). Based on Cobaugh's prior conviction, a trooper for the Pennsylvania State Police filed a complaint for a violation of the PUFA. (Vol. 13, Pet.Ex. 7). Sometime thereafter, Det. Rok and Assistant District Attorney Patrick Kiniry learned of the charges.

Four months before the Knaze trial, on February 2, 1993, the preliminary hearing on Cobaugh's PUFA charge took place. (*Id.*) The local newspaper, the Tribune-Democrat, reported that the district justice dismissed the case on grounds that "there's justification for self-protection" *i.e.,* she purchased the gun right after her alleged sexual assault. (*Id.*)

At the PCRA hearing, Simmons presented evidence that demonstrated that the charges against Cobaugh were dismissed as a result of the direct intervention of the prosecutor in the Knaze case and Det. Rok. Det. Rok testified that Kiniry asked the Pennsylvania State Police whether Cobaugh's voluntary surrender of

the weapon to the Johnstown Police Department would satisfy their complaint. (3/10/98 Tr. at 88, 142). Cobaugh ultimately surrendered her gun to Det. Rok with the understanding that the charges against her would be dismissed. (*Id.* at 88–89). Kiniry also acknowledged that he had "made a call or two" to see if the Pennsylvania State Police would withdraw the charges against Cobaugh, and that he "asked the [c]ourt or one of the other assistant DA's to nol pros them." (*Id.* at 142).

In addition, Simmons also presented evidence to establish that, in order to obtain the firearm, Cobaugh must have falsely filled out state and federal weapons forms. (*Id.* at 90). Kiniry testified that he had seen both the Pennsylvania Firearms form and the Federal Bureau of Alcohol, Tobacco, and Firearms form that Cobaugh had filled out, and admitted that she attested, in signing both forms under the penalty of perjury, that she had never been convicted of a disqualifying crime. (*Id.* at 143–47). He further admitted that he was still in possession of both the forms, and that he never forwarded them to the appropriate authorities, as he had done in other cases where perjury was suspected. (*Id.*)

### 3. Lab Reports Related to Cobaugh's Alleged Sexual Assault

During the PCRA proceedings, Simmons demonstrated that three lab reports containing the results of tests conducted on the clothing that Cobaugh was wearing at the time of her alleged sexual assault were not disclosed to the defense. Prior to the September 1998 PCRA hearing, Respondents produced the three lab reports. (Vol. 17, # 235, Pet.Ex. 3). Each lab report was prepared by a forensic scientist from the Pennsylvania State Police Laboratory Division of the Greensburg Regional Laboratory and was sent to Det. Rok's attention.

The lab report dated September 21, 1992, provides the results of an analysis of Cobaugh's: (a) purple nightgown; (b) striped nightgown; (c) pink robe; and (d) underwear. Under "RESULTS" the report indicates that *no blood or seminal material was detected on any of the items submitted.* (9/21/92 Report, "RESULTS" ¶ 1 (emphasis added)). The report also indicates that two human hairs were removed from Cobaugh's purple nightgown and one brown human hair was removed from her striped nightgown. (*Id.*, "RESULTS" ¶¶ 2, 3).

The lab report dated February 25, 1993, provides the results of analyses of the human hair lifted from Cobaugh's purple nightgown and her striped nightgown against: (1) the head and pubic hair standards of Simmons; and, (2) the head hair standards of Cobaugh. (2/25/93 Report "ITEMS" ¶¶ 1–5). Under "RESULTS," the report indicates *that the hairs removed from the purple nightgown were similar to Cobaugh's head hair and different then Simmons's head and pubic hair.* (2/25/93 Report, "RESULTS" ¶ 3 (emphasis added)). It also indicates that *Simmons's head and pubic hair were visually different than the hair removed from the striped nightgown.* (*Id.*, "RESULTS" ¶ 4 (emphasis added)). The report also notes that the hair removed from the striped nightgown was different than Cobaugh's head hair, but that no comparison could be made with her pubic hair because no standards were submitted. (*Id.*, "RESULTS" ¶ 4).

Thereafter, Cobaugh submitted pubic hair standards, and those were analyzed against the hair removed from the striped nightgown. (5/25/93 Report, "ITEMS" ¶ 2). The report dated May 25, 1993, revealed that pubic hair removed from the striped nightgown was consistent with Cobaugh's pubic hair standards. (*Id.*, "RESULTS" ¶ 2).

Taken together, the three lab reports reveal that there that: (1) no blood or seminal material was detected on Cobaugh's underwear or on any of the clothing she wore the night of her alleged sexual assault; and (2) hairs collected from Cobaugh's purple nightgown and striped nightgown were consistent with Cobaugh's head and pubic hair and different from Simmons's head and pubic hair.[12]

Notwithstanding the defense's pretrial discovery request for the "[r]esults or reports of scientific tests" and "any evidence favorable to the accused which is material either to guilt or to punishment," (Mt. for Pretrial Discovery and Inspection, Vol. 14, #211, Pet. Ex. 14; Commonwealth's Response to Request for Mandatory Disclosure, Vol. 14, #211, Pet. Ex. 15), the prosecution did not disclose any of the above-cited lab reports to the defense during the Knaze homicide proceedings.[13] (Doc. 19 at 17; doc. 29 at 42).

### 4. Evidence That Cobaugh Failed to Identify Simmons In a Mug Book

At Simmons's trial, the prosecution introduced evidence that, during an October 1992 interview with Det. Rok, Cobaugh identified Simmons from a photo array. (6/3/93 Trial Tr. at 133–34). It also introduced evidence that Cobaugh identified Simmons from an in-person line-up that was conducted in December 1992. (*Id.* at 134, 175; 6/4/93 Trial Tr. at 100).

During the PCRA hearings, Simmons established that, before Cobaugh identified him out of the photo array, she had failed to identify him from a mug book Det. Rok had provided to her. (3/10/98 Tr. at 100–101). This information was never disclosed to the defense. Moreover, Det. Rok

12. Simmons contends that the lab reports demonstrate that the hair removed from Cobaugh's striped nightgown was inconsistent with both Cobaugh's and Simmons's standards. (Doc. 10 at 33; doc. 17 at 34). Our review of the lab reports reveals otherwise. The report dated September 21, 1992, establishes that "[o]ne ... medium dark brown human hair" was removed from the striped nightgown. (9/21/93 Report ¶¶ 1(b), 3). The report dated February 25, 1993, reveals that the one hair recovered from the striped nightgown was visually different from Simmons's head and pubic hair and visually different from Cobaugh's *head* hair. (2/25/93 Report ¶ 4). The report also noted that no pubic hair from Cobaugh was submitted for comparison. (*Id.*) Cobaugh's pubic hairs were eventually submitted for analysis, however, and the report dated May 25, 1993, demonstrates that Cobaugh's pubic hair was visually consistent with the hair recovered from the striped nightgown. (5/25/93 Report ¶¶ 2, 4). Thus, the hair removed from Cobaugh's purple and striped nightgowns were visually consistent with her own hair. None of the hair removed from her clothing was inconsistent with her hair.

13. The lab reports dated September 21, 1992, and May 25, 1993, were first disclosed to Simmons a day or so before the September

10, 1998, PCRA hearing. (9/10/98 Tr. 7–9, 94–95). It appears that the Commonwealth disclosed the lab report dated February 25, 1993, in response to the defense's discovery requests propounded in the Cobaugh sexual assault case. (*See* Commonwealth's Response to Request for Mandatory Disclosure, Vol. 14, Pet. Ex. 16). The date of the disclosure is not reflected in the record before this Court. In any event, Respondents have not contended, either before this Court, the PCRA court, or the Pennsylvania Supreme Court, that disclosure of the February 25, 1993, lab report in response to discovery requests in the Cobaugh sexual assault case satisfied its disclosure obligations with respect to that document in the Knaze homicide case. Indeed, before the state courts, Respondents maintained that, although the prosecution failed to disclose the laboratory reports, disclosure was not mandated during the Knaze homicide proceedings because the reports were inconclusive and not exculpatory. (*See* Br. for Appellee at 10, attached to doc. 17). Before this Court, they admit that the lab reports should have been produced (Doc. 29 at 42), and that the only issue that the Court need decide is whether the suppression was material.

inaccurately testified at a preliminary hearing conducted in January 1993 in the Cobaugh sexual assault case that no mug book had been shown to Cobaugh. (12/22/92 Tr. at 79, Vol. 9). At the PCRA hearing, Simmons's trial counsel testified that, had he been aware of Cobaugh's initial failure to make a mug-book identification, he would not have requested the December 1992 in-person line-up. (9/10/98 Tr. at 194–95).

### Legal Analysis

■ In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Id.* at 87, 83 S.Ct. 1194; *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (*Brady* applies even in absence of request for the evidence by the accused). The precepts of *Brady* are premised upon the most basic of constitutional guarantees to a person accused of a crime: a right to due process of law and a fair trial. Simply put, in our system of criminal justice, the government is not entitled to send a person to prison while it conceals from him favorable evidence that would tend to reasonably call into question his guilt. Impeachment evidence squarely falls within the category of evidence that must be disclosed because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104

(1972); *see also United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ There are two components to a *Brady* claim: 1) favorable evidence must have been suppressed by the government, either intentionally or inadvertently; and 2) the suppressed evidence was material. *See e.g., Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir.2004); *see also Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

### The Prosecution Suppressed Favorable Evidence

Simmons easily satisfies the first *Brady* component with respect to each of the four categories of evidence at issue. Respondents acknowledge that the prosecution should have, but did not, disclose the evidence regarding Pletcher's cooperation with investigators.[14] (Doc. 29 at 27–31). They further admit that this information was favorable because it could have been used by the defense as impeachment evidence. (*Id.* at 31 ("[T]he fact that she did wear a wire, that would have been impeachable material.")) They do not dispute that the prosecution should have, but did not, disclose to the defense Kiniry's and Det. Rok's involvement in having the gun charges dismissed against Cobaugh. (*Id.* at 45–46; doc. 19 at 19). Nor do they dispute that Kiniry kept in his possession the firearms forms containing Cobaugh's false statements, instead of forwarding them to the appropriate authorities. (*Id.*) They also admit that this information would have been favorable to the defense because Simmons could have used it to question Cobaugh's motives for testifying favorably for the prosecution. (Doc. 29 at

---

**14.** As discussed more fully below, Det. Rok and Assistant District Attorneys Patrick Kiniry and Gary Costlow attributed the failure to inform the defense of Pletcher's cooperation with the prosecution to simple forgetfulness, even though Det. Rok acknowledged that the Johnston Police Department "very rarely" used electronic surveillance, and had not done so since Simmons's case. (9/10/98 Tr. at 28–29).

45–46). Finally, they concede that the prosecution should have, but did not, disclose both the lab reports and Cobaugh's failure to identify Simmons out of the mug book. (Doc. 19 at 17, 20–21; doc. 29 at 42). They further concede that, at the very least, this information could have been used by the defense to impeach Cobaugh's testimony. (Doc. 29 at 43; doc. 19 at 20–21).

Thus, the principal dispute in this case is whether Simmons has demonstrated the second component of a *Brady* claim: that the suppressed evidence was material. The Third Circuit Court recently stated:

> The Supreme Court has elucidated the *Brady* materiality standard as follows: "[The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Slutzker*, 393 F.3d at 387 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Importantly, the Supreme Court has instructed that in making a determination regarding materiality, the reviewing court must consider the cumulative effect of all the suppressed information. *Kyles*, 514 U.S. at 436–37, 115 S.Ct. 1555; *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375.

**The Suppressed Evidence Was Material**

█ "If you open your motherfucking mouth, you'll get the same thing Anna Knaze got." This threat, allegedly made by Simmons to Cobaugh, was the centerpiece of the prosecution's case. So important was this alleged threat to the prosecution's case that the prosecutor began and ended his opening statement to the jury by quoting it. (6/1/93 Trial Tr. at 17–25). He also repeated it two more times in the opening paragraph of his statement. (*Id.* at 17). In closing arguments, the prosecutor once again focused the jury's attention on the alleged threat and stated that "it sums up this whole case." (6/4/93 Trial Tr. at 84).

It was thus essential for the prosecution to convince the jury that Simmons was Cobaugh's attacker and that it was he who made the alleged threat to her in the early morning hours of May 6, 1992. Two witnesses provided the vital testimony for the prosecution on these points: Cobaugh, of course, and LaCherie Pletcher. Yet, each woman's recollection of events had changed dramatically and to the benefit of the prosecution between the time she initially spoke with police and the time she testified at trial. Due to the prosecution's misconduct, however, the defense lacked the critical component necessary to an effective cross examination—knowledge that they each had a powerful and plausible motive to lie.

As previously discussed, at the August 18, 1992, Coroner's Inquest and in her August 11, 1992, statement to Det. Rok, Pletcher maintained that Simmons was at home at 10:00 p.m. the night of May 5, 1992, and that he stayed home with her for the rest of the night. (6/2/93 Trial Tr. at 140–44; *see also* 8/11/92 Stmnt. of L. Pletcher, Vol. 14). If her previous testimony and statements were accurate, then Simmons could not have been the man who allegedly attacked Cobaugh, because he was at home with Pletcher at the time Cobaugh claimed she was attacked.

The defense attempted to discredit Pletcher's trial testimony by suggested that her recollection changed at trial in order to accommodate the prosecution's theory that Simmons was Cobaugh's attacker. (6/4/93 Trial Tr. at 75). That theory, defense counsel reminded the jury,

had not emerged until Det. Rok secured a statement from Cobaugh on October 9, 1992, and she for the first time gave information linking her alleged attack to the Knaze crimes and to Simmons. (*Id.*)

But what if the jury had learned what Pletcher testified to at the PCRA hearing? That Det. Rok told her that she was a suspect in the Knaze murder investigation (4/13/98 Tr. at 19–21, 26); that, because she "was scared [Det. Rok] was going to pin something on [her] and [she] was worried about the welfare of [her] daughter," she agreed to participate in police surveillance of Simmons (*id.* at 13); that she attempted to secure incriminating statements from him (*id.* at 11); that she felt like she had "no choice" but to cooperate with the prosecution (*id.* at 19); and that Det. Rok "threatened to put [her] in jail if [she] didn't cooperate"? (*Id.* at 26).[15]

Had the jury learned of this information, it may well have distrusted Pletcher's trial testimony. It may have found that her recollection of when Simmons came home changed because she feared prosecution as an accessory in the Knaze case and feared for the welfare of her daughter. It may have even distrusted other parts of her testimony. The defense certainly would have had compelling support for its suggestion that Pletcher changed her account of when Simmons came home so as not to conflict with the prosecution's theory that Simmons was the man who attacked Cobaugh and who made the alleged threat implicating himself in the Knaze crimes.

As with Pletcher, the defense was also deprived with the opportunity of demonstrating that Cobaugh had a motive to testify untruthfully. In Cobaugh's statement to Officer Krug on May 6, 1992, she did not report the threat her alleged attacker made to her. She also could not identify him. It was not until Det. Rok interviewed her on October 1992—with her PUFA charge pending—that she provided the prosecution with an identification of Simmons as her attacker and his statements to her incriminating himself as the Knaze murderer.

Respondents do not dispute that as a result of Kiniry's and Det. Rok's intercession on her behalf, Cobaugh possibly was saved not only from having to face a gun charge under the PUFA, but she also avoided possible criminal exposure for violations of Pennsylvania and federal law. Although defense counsel certainly knew that the PUFA charges against Cobaugh had been dismissed, they had no reason to suspect Det. Rok's and Kiniry's involvement in the dismissal. Moreover, they also would have expected that the prosecution would have disclosed their involvement, because it clearly understood its obligation to do so. Prior to the trial, Assistant District Attorney Costlow disclosed to the defense that he had made a telephone call to the Cambria County Jail to assist Gary Bough with issues he was having with his parole. (6/1/93 Trial Tr. at 38–39). The prosecution was not

---

15. The PCRA court determined that Pletcher's cooperation had limited impeachment value because she cooperated willingly. (PCRA Op. at 9, Vol. 6). To the extent that characterization amounts to a finding of fact subject to review under 28 U.S.C. § 2254(d)(2), we conclude that it is "unreasonable" in light of the evidence presented at the PCRA hearing. Pletcher testified repeatedly that she was afraid of prosecution and afraid of what would happened to her daughter if she did

not cooperate. She "agreed" to cooperated to avoid such consequences. Her belief that she was under threat of prosecution is classic impeachment evidence. *See e.g., Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir. 1986) ("the thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving testimony") (internal quotation marks and citation omitted).

forthcoming, however, relative to the assistance it provided to Cobaugh. Considering Cobaugh's importance to the prosecution's case, the defense was undeniably prejudiced by the prosecution's failure to disclose her possible motives for testifying favorably for it.

Additionally, Simmons has demonstrated that the prosecution's suppression of the lab reports and the failed mug book identification deprived the defense of further corroborative support for its position that Cobaugh's identification of Simmons as her alleged attacker was untrustworthy. Respondents acknowledge that the lab reports could have been used by the defense to impeach Cobaugh. (Doc. 29 at 43). Nonetheless, they argue that their suppression was not material because the reports were "inconclusive." Describing the lab reports as "inconclusive," however, does not negate the value of the reports to the defense. Although the lab reports do not conclusively establish that someone other than Simmons was Cobaugh's alleged attacker, the reports would have provided the defense with evidence to further buttress its position that her identification of Simmons was unreliable.

The reports reveal that no hair, blood, and semen linked Simmons to Cobaugh's alleged attack. Pennsylvania law recognizes that this type of "negative evidence," i.e., evidence tending to prove the non-existence of a fact, has some probity. Cf., Commonwealth v. Hawk, 551 Pa. 71, 709 A.2d 373 (1998) (lab results establishing that no hairs or semen of the defendant was found on victim's clothing relevant to sexual assault conviction). As Justice Saylor noted in his dissent in Simmons 2, the lab reports could be classified as "neutral" evidence, but "evidence such as this may, because of its neutrality, tend to be favorable to the accused. While it does not by any means establish his absence from the scene of the crime, it does demonstrate

that a number of factors which could link the defendant to the crime do not." 804 A.2d at 643 n. 1 (Saylor, J., dissenting) (quoting Patler v. Slayton, 503 F.2d 472, 478–79 (4th Cir.1974); citing People v. Nichols, 63 Ill.2d 443, 349 N.E.2d 40, 43 (1976)).

As for Cobaugh's failed mug book identification, since the defense was unaware of this fact at trial, it was unable to use the information to impeach Cobaugh's other identifications of Simmons. Moreover, during its pretrial preparation, the defense—unaware of either the failed mug book identification or Officer Krug's Report (which was not disclosed until three days before trial)—made the decision of subjecting Simmons to an in-person identification. The decision was risky, because, by the time of the line-up in December 1992, Simmons's picture had been shown extensively in the news media. Defense counsel testified that had he been informed of the failed mug-book identification, he would not have requested an in-person line up that potentially could have (and likely did) bolster Cobaugh's credibility. (9/10/98 Tr. at 194–95).

Simmons has established that had the prosecution disclosed Cobaugh's failed mug-book identification, the evidence as to her identification of Simmons would have been as follows: (1) evidence of Officer Krug's Report, in which Cobaugh stated that she did not get a good look at her attacker and did not seek he face; (2) her failure to pick Simmons's photograph from the mug book; against (3) the fact that she identified him from a six-person photograph spread after she had seen his photograph in the news media, identified as the man charged with killing Knaze. See Bagley, 473 U.S. at 683, 105 S.Ct. 3375 (court should assess the effect of a failure to disclose on the preparation of the defense case, as well as the actual presentation of evidence at trial).

### Conclusion

We conclude that the improperly suppressed evidence resulted in a verdict unworthy of confidence. All of the evidence at issue would have significantly undermined the credibility of the two key prosecution witnesses. Although the PCRA reached the opposite conclusion, it did so by finding that no single item of withheld evidence prejudiced the defense. Respondents concede, however, that the PCRA court's decision was at odds with the Supreme Court's decision in *Kyles*, which requires that the suppressed evidence be considered collectively, not item by item. (Doc. 29 at 33); *see also Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir.2003).

■ Finally, although the accounts of Thelma Blough, Gary Blough, and Tammy Ickes place Simmons with Knaze outside her home shortly before her murder, for the reasons previously discussed, their reliability was highly questionable. Moreover, their identifications were clearly of secondary importance to the prosecution's case. It is important to stress again that *Brady's* materiality test is not a sufficiency of the evidence test. Simmons is not required to show that no reasonable jury could convict. *See Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555. Although we cannot say with certainty that the jury would have reached a different conclusion on its verdict, Simmons has demonstrated a "rea-

sonable probability" that it would have done so. *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. The state courts' decisions to the contrary were an "unreasonable application of" clearly established Supreme Court precedent. As a result, Simmons is entitled to relief on his convictions and sentences for first-degree murder and robbery.[16]

### 2. *Massiah* Claim

In his next claim for relief, Simmons contends the prosecution violated his Sixth, Fifth, and Fourteenth Amendment rights as set forth in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) when it improperly used Pletcher to conducted surveillance of him after his constitutional right to counsel had attached.[17]

### Factual background

On August 19, 1992, the prosecution initiated its formal prosecution in the Knaze case by filing a complaint charging Simmons with homicide and robbery. Unquestionably, his right to counsel had attached when it, with the assistance of Pletcher, electronically intercepted: (1) a telephone call Simmons made to her home on August 26, 1992; and (2) an in-person conversation between Simmons and Pletcher during a visit to SCI–Cresson on August 29, 1992 ("the SCI–Cresson intercept").[18]

---

**16.** Simmons raises numerous claims with regard to the sentencing phase of his trial. Because he is entitled to relief from his conviction for first-degree murder, the conviction upon which his death sentence depends, we need not address his remaining sentencing-phase claims.

**17.** This is Claim II in the Petition.

**18.** Simmons's efforts during the PCRA proceedings to obtain the information regarding the surveillance was anything but easy. First, prior to Pletcher's April 1998 PCRA testimony, Simmons issued subpoenas for any and all

documents relating to the use of electronic intercepts and tapes of the electronic records. Respondents produced a single document: a reported dated August 26, 1992, which indicated that Pletcher's home telephone was tapped during a called she received from Simmons, who was incarcerated at SCI–Cresson at that time. (Vol. 13, Pet.Ex. 4). Thereafter, on March 10, 1998, Det. Rok testified that, while Pletcher participated in surveillance of Simmons, there were no tape recordings made from any of the intercepts. (3/10/98 Tr. at 49, 54, 67, 69). He recalled that investigators did fit Pletcher with a body wire for a visit to SCI–Cresson, but he stated that

One of the purposes of the surveillance was to secure "crucial evidence against Simmons in regards to [the Knaze] homicide case[.]" (8/21/92 Consensual Electronic Surveillance Officer's Memo., Vol. 17, Def.'s Ex. 1 at 18–21).[19] Investigators also hoped to secure a confession from Simmons. (*Id.*; *see also* 9/10/98 Tr. at 98–99). Det. Rok instructed Pletcher to ask Simmons about his involvement in the Knaze homicide, his alibi for the crime, and about the photo driver's license she had found in his wallet in April 1992. (3/10/98 Tr. at 65; 4/13/98 Tr. at 11).

The actual audiotapes of the August 26, 1992, telephone call and the SCI–Cresson intercept (Vols. 19–25), as well as the transcriptions of the tapes (Vol. 17, PCRA Joint Ex. 1A) were produced by Respondents for the first time prior to the September 10, 1998, PCRA hearing. The August 26 intercept recorded an approximately ten-minute telephone conversation between Pletcher and Simmons. (8/26/92 Tr. at 6, 15–16). The transcript reveals that they spoke about personal matters, and that Simmons asked Pletcher to visit him at SCI–Cresson. (*Id.* at 7–8, 13). Despite Pletcher's attempts to get Simmons to talk about the case (*see id.* at 16), Simmons refused to discuss the matter over the telephone.

The SCI–Cresson intercept reveals that, once again, Pletcher and Simmons primarily spoke about personal matters. (*See* 8/29/92 Tr. at 2–86). Pletcher did attempt to gain information about the case. (*Id.*) However, Simmons made no statements incriminating himself in the Knaze murder. (*Id.*) As a result, Det. Rok determined that investigators did not gain any evidentiary value from the surveillance and he told Kiniry that the "we didn't get any information that we wanted from the tapes." (9/10/98 Tr. at 29, 38, 99). As a result, the

Pletcher's visit with Simmons was "very brief" because Simmons immediately located the wire. (*Id.* at 44, 49). As a result of the brevity of the meeting, Det. Rok testified, no recording was made. (*Id.* at 49–50). Kiniry, who testified at that same hearing, recalled being told that "there was nothing intercepted" from the SCI–Cresson visit because Simmons detected the body wire. (*Id.* at 136).

It was not until after Pletcher testified at the April 13, 1998, PCRA hearing that her visit with Simmons at SCI–Cresson lasted over one hour that Simmons actually was able to obtain a fuller picture of what occurred regarding the surveillance. After her testimony, the audio tapes from both the August 26, 1992 phone intercept and the SCI–Cresson intercept were discovered by Respondents. The tapes were then produced, along with other paperwork related to the intercepts. (*See* Doc. 10 at 15). At that time, it was revealed that paperwork regarding the intercepts had been missing and was eventually located at the home of Sergeant Angelo Cancelliere of the Johnstown Police Department. The Johnstown Police Department conducted an internal investigation of Sgt. Cancelliere's actions, and in a disciplinary hearing he was found guilty of a level three infraction, "which is the most serious." (Doc. 10 at 15–16 (citing 7/10/98 Tr. at 5–6)).

At the September 10, 1998, PCRA hearing, Det. Rok attributed his prior PCRA testimony that there were "no tapes" and that the SCI–Cresson intercept was very brief to a combination of the passage of time (9/10/98 Tr. at 37), Sgt. Cancelliere's failure to follow proper procedure regarding the intercepts (*id.* at 26–27), the lack of evidentiary value to the prosecution of the intercepts (*id.* at 38–39), and a simple mistake (*id.* at 29). Kiniry also testified that the loss of the documentation regarding the intercepts and of the audio tapes themselves was "highly irregular," and he took full responsibility for the prosecution's failure to disclose this information. (*Id.* at 260–62, 264).

19. Another purpose of the intercept was to gain information regarding "another homicide in which Simmons is a suspect and other crimes against the elderly in which Simmons may be a suspect." (8/21/92 Consensual Electronic Surveillance Officer's Memo., Vol. 17, Def.'s Ex. 1 at 21).

tapes were filed away and not introduced at trial.

### Legal Analysis

In *Massiah*, the defendant was indicted for violating the federal narcotics laws and was released on bail pending trial. 377 U.S. at 201, 84 S.Ct. 1199. While free on bail, one of Massiah's co-defendants decided to cooperate with the government and permitted federal agents to install a listening device under the front seat of his car. *Id.* at 202–23, 84 S.Ct. 1199. A short time later, Massiah and the co-defendant had a lengthy conversation while sitting in the co-defendant's car. *Id.* at 203, 84 S.Ct. 1199. Unbeknownst to Massiah, a federal agent sat in a parked car a short distance away and listened to the conversation between the two men. *Id.* Massiah made several incriminating statements, and these statements were brought to the jury's attention through the testimony of the federal agent. *Id.* The jury convicted Massiah and the conviction was affirmed. On appeal, the Supreme Court reversed. In particular, the Court held that the government violated Massiah's constitutional rights when it "deliberately elicited" incriminating statements from him "after he had been indicted and in the absence of counsel." *Id.* at 206, 84 S.Ct. 1199.

Simmons contends that he has established a *Massiah* violation. (Doc. 17 at 30). Respondents counter that he is not entitled to relief under *Massiah* because he made no incriminating statements during his recorded conversations and the tapes were not introduced at trial; therefore, any violation of Simmons's rights that may have occurred did not prejudice him. (Doc. 19 at 14–15). In response, Simmons acknowledges that if this "claim were a garden variety claim under" *Massiah*, the Commonwealth's position may have merit. (Doc. 22 at 31). However, he argues that because the prosecution obtained confidential defense strategy information through its surveillance, prejudice is presumed pursuant to the Supreme Court's decision in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). (Doc. 17 at 30; doc. 22 at 31).

### Weatherford v. Bursey

In *Weatherford*, a convicted state prisoner, Bursey, brought a civil rights actions against Weatherford, an undercover government agent. 429 U.S at 548, 97 S.Ct. 837. In order to maintain Weatherford's undercover status, police had arrested him, along with Bursey, for an offense in which both had participated. After their arrests, Weatherford attended, at Bursey's requests, two pretrial meetings with Bursey and his lawyer. Following Bursey's criminal trial, during which Weatherford's status as an undercover agent was revealed, Bursey filed his civil rights action. In that suit, Bursey claimed that Weatherford had communicated to prosecutors the defense strategies and plans that he had learned at his meetings with Bursey and his attorney, thereby depriving him of the effective assistance of counsel and of a fair trial. *Id.* at 548–49, 97 S.Ct. 837.

The district court granted judgement in favor of the state. The Court of Appeals for the Fourth Circuit reversed. *Bursey v. Weatherford*, 528 F.2d 483 (4th Cir. 1975). It held that "whenever the prosecution knowingly arranges or permits intrusions into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Id.* at 486.

The Supreme Court rejected the Fourth Circuit Court's approach. In so holding, it emphasized that Weatherford had kept the information he learned at the attorney-client meetings entirely to himself. *Weatherford*, 429 U.S. at 548, 97 S.Ct. 837. It noted that, after conducting a hearing, the district court found as a matter of fact that Weatherford communicated nothing

at all to his superiors or the prosecution about Bursey's trial plans. *Id.* at 554–56, 97 S.Ct. 837. Thus, the prosecution had not learned of the details of Bursey's conversations with his counsel about trial preparations. *Id.* Nor had Weatherford testified at trial as to the conversation between Bursey and his attorney. *Id.* at 554–56, 97 S.Ct. 837. Finally, it noted that none of the state's evidence had originated from Weatherford's presence at Bursey's meetings with his attorney. *Id.* Had any of these things occurred, the Supreme Court noted, "Bursey would have a much stronger case." *Id.* at 554, 97 S.Ct. 837.

The reach of the *Weatherford* ruling is uncertain. Some courts of appeals have determined that when the government obtained confidential defense strategy through the use of an agent or confidential informant, prejudice is presumed. *See United States v. Levy,* 577 F.2d 200 (3d Cir.1978); *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir.1995). Other courts of appeals require a showing of actual prejudice. *See e.g., United States v. Danielson,* 325 F.3d 1054, 1071 (9th Cir.2003); *United States v. Steele,* 727 F.2d 580, 586 (6th Cir.1984). In *Levy,* the Third Circuit Court adopted the former approach. It held:

> Where there is a knowing invasion of the attorney-client relationship *and where confidential information is disclosed to the government,* we think that there are overwhelming considerations militating against a standard which tests the Sixth Amendment violation by weighing how prejudicial to the defense the disclosure is.... [I]t is highly unlikely that a court can ... arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in

the selection of jurors, or in the dynamics of trial itself.

*Id.* at 208–09 (emphasis added). It also adopted the rule that it had gleaned from other federal court decisions that were on point: "[T]hat [the] mere intrusion by the informer into the defense camp will not require relief absent a showing of prejudice, but that prejudice will be presumed if the informer transmits information on defense strategy to the government." *Id.* at 207–08 (citing *United States v. Cooper,* 397 F.Supp. 277 (D.Neb.1975); *United States v. Crow Dog,* 532 F.2d 1182, 1197–98 (8th Cir.1976) (quoting and adopting the *Cooper* analysis)); *but see United States v. Voigt,* 89 F.3d 1050, 1070 n. 9 (3d Cir.1996) (suggesting in *dicta* that even when the government conduct is deliberate, the defendant must demonstrate prejudice).

### May the Court Presume Prejudice?

Simmons contends that, pursuant to *Weatherford,* he is entitled to relief because the prosecution learned two pieces of information through Pletcher's surveillance of Simmons that enabled it "to determine the facts [he] would rely on to establish his defense of alibi." (Doc. 17 at 30). The Court is unpersuaded.

Simmons has not established that the "presumption of prejudice" is "clearly established law Federal law, *as determined by the Supreme Court.*" 28 U.S.C. § 2254(d)(1) (emphasis added). The courts of appeals are still divided on *Weatherford's* reach and whether and how prejudice may be presumed. *See Danielson,* 325 F.3d at 1071 (collecting cases); *Shillinger,* 70 F.3d at 1140–41 (collecting cases). Thus, this Court cannot say that the "presumption of prejudice" is clearly established law as determined by the Supreme Court. *See Kesser v. Cambra,* 392 F.3d 327, 335 (9th Cir.2004) (the Supreme Court's holdings are binding on the state

courts and only those holdings need be reasonably applied by them).

■ However, even if § 2254(d) was inapplicable to this claim and the Court was free to apply Third Circuit Court precedent, Simmons has still not shown that he is entitled to a presumption of prejudice. He contends that "[t]he SCI–Cresson intercept revealed [his] belief that there was only a 45–minute period for which he did not have a witness to establish his whereabouts on the morning of May 5." (Doc. 17 at 30 (citing 8/29/92 Tr. at 53, 78)). Second, he contends that "[t]he Commonwealth also learned that in accounting for this 45–minute period, the defense would cite to a funeral procession that delayed [him] in picking up Ms. Pletcher." (Id. (citing 8/29/92 Tr. at 78)). We disagree with his characterizations of these two discussions. After reviewing the entire record in this case, and after putting the discussions at issue in context, we conclude that in the two instances relied upon by Simmons, he did not reveal to Pletcher confidential defense strategy.

At page 53 of the SCI–Cresson intercept, Simmons stated to Pletcher: "they're calling the death between 11:00 and one o'clock. Well, surely there's no way I could have done that within 45 to a half an hour because I was in town after 11 o'clock. That's a fact. That is a fact. And I have people that will prove that." (8/29/92 Tr. at 53–54, Vol. 17). On page 78, he stated again: "I got back into town about 11 o'clock or a little after." (Id. at 78). These two statements to Pletcher do not reveal any confidential defense information, however, because Simmons had already publicly maintained in an interview with a local news reporter that he had witnesses that could account for his whereabouts on May 5, 1992.

On June 17, 1992, Simmons gave an interview to Jeff Allen, the News Director of Fox Channel 8 television station. (See 8/19/92 Aff. of Prob. Cause at 3, attached to Criminal Complaint, Vol. 1; see also 2/22/93 Tr. at 16–26, Vol. 1). In that interview, Simmons told Allen: "When I was fingerprinted here, about four weeks ago.... I ... tried to tell this gentleman that the *time that you all claim that this incident happened, I have witnesses that will verify that I was with them all day.*" (2/22/93 Tr. at 19–20 (emphasis added)). Simmons also stated to Allen: "So they said it [the Knaze's homicide] happened on [May] 5th, which was a Tuesday. The 5th[,] I had [sic] *adequate amount of people that will go and swear affidavits that I was with them all day. All day.....* So, you know, as far as the dates that they are presenting, either on the TV or in the papers, I have got myself covered, well, to, so to speak, a T." (Id. at 25–26 (emphasis added)).

There is no material difference between what Simmons told Pletcher during the SCI–Cresson intercept about having witnesses "that can prove" his whereabouts on May 5, and his earlier interview with Allen in which he swore he could produce people that could verify his whereabouts during the relevant time period. He provided no more detail to Pletcher than he did to Allen. Thus, we conclude that in the statement at issue to Pletcher, Simmons revealed nothing about his potential alibi beyond that which he had already publicly stated. He did not disclose to her confidential defense strategies.

Similarly lacking in merit is Simmons's claim that the prosecution learned through the SCI–Cresson intercept that in accounting for his whereabouts during the forty-five minutes at issue, "the defense would cite to a funeral procession that delayed [Simmons] in picking up Ms. Pletcher." (Doc. 17 at 30). Simmons actually stated: "Do you know the thing about me driving slow, Kitty and them—Kitty and them made a statement about me driving. They

basically told the truth, you know. You know, she said that when we came—I didn't know, you know, we went passed [Knaze's] house. But I do remember driving slow for the funeral thing." (8/29/93 Tr. at 77–78, Vol. 17). It appears that he simply was speaking about statements that Kitty McKinney gave to the police, which were contained in an affidavit of probable cause that was attached to a search warrant served upon him at SCI–Cresson on or around August 17, 1992. (8/17/92 Search Warrant; 8/17/92 Aff. of Prob. Cause, Vol. 3). Therein, Det. Rok attested:

> On 11 AUG 92 this detective interviewed one Kitty McKinny.... She stated that on 5–5–92 she along with her mother received a ride from Ernest Simmons and La Cherei [sic] Pletcher. Pletcher[']s 10 month old daughter ... was also pres[e]nt. Kitty stated that....at approx. 10:05 a.m. Pletcher and her daughter were dropped off in front of the domestic relations office, and Kitty along with her mother were then taken by Simmons to go get Kitty's car in East Conemaugh. The route of travel was on Maple Ave. *Kitty stated that at Apprx. 10:35 a.m. while in Simmons['s] car, and Simmons driving they got behind a funeral procession on Maple Ave[.] in the Area of St. Anthony's Church. At this time they had to drive very slowly, and she stated that Simmons was in fact driving slowly.*

(8/17/92 Aff. of Prob. Cause at 3–4 (emphasis added)).

Contrary to Simmons's contention, he never stated to Pletcher during the SCI–Cresson intercept that he could or was planning to account for his whereabout during the forty-five minutes at issue because he drove slow due to the funeral. All that he said was that he remembered the funeral. His statement cannot be fairly read to support his current characterization of it.

### Conclusion

Because we find that Simmons has failed to demonstrate that he revealed confidential defense strategy to the prosecution during the SCI–Cresson intercept, his claim must fail. We also conclude that Simmons has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and therefore he is not entitled to a certificate of appealability on this claim.[20] In arriving at this conclusion, we do not condone the behavior of investigators, who specifically instructed Pletcher to gain information about the Knaze homicide and any potential alibi Simmons might have after his right to counsel had attached. However, since no confidential defense information was disclosed, prejudice may not be not presumed. Even if Simmons does not have to show how the prosecution used his confidential defense information, he at least has to show that such information was disclosed. *Levy,* 577 F.2d at 207 (quoting *Cooper,* 397 F.Supp. at 285) ("I am convinced that there must be the *actual gaining, rather than mere opportunity for gaining, of information relative to a charge against the defendant,*" before prejudice will be presumed.); *United States v. Costanzo,* 740 F.2d 251, 257 (3d Cir.1984) (disclosures did not involve confidential defense strategy; therefore showing of prejudice required); *accord Shillinger,* 70 F.3d at 1142 (prejudiced presumed only "when the state becomes privy to confidential

---

**20.** In order to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2), Simmons "must demonstrate that reasonable jurists would find the district court's assessment of the constitution-al claims debatable or wrong." *Lambert,* 387 F.3d at 230 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so").

## B. Guilt–Phase Ineffective Assistance of Counsel

Simmons claims that he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights during the guilt-phase of his trial. Whether considered individually or cumulatively, however, these two guilt-phase ineffective assistance claims are without merit.

### 1. The *Strickland* Standard

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set out two components to a Sixth Amendment claim for ineffective assistance of counsel. *See also Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams,* 529 U.S. at 390–91, 120 S.Ct. 1495. First, the petitioner must show that counsel's performance was deficient. This requires him to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 689, 690–92, 104 S.Ct. 2052. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id.* at 689, 104 S.Ct. 2052.

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 690–91, 104 S.Ct. 2052.

*Strickland* also requires a petitioner to demonstrate that counsel's errors prejudiced the defense. *Id.* at 687, 692, 104 S.Ct. 2052. To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052; *Wiggins,* 539 U.S. at 532, 123 S.Ct. 2527. The Supreme Court has counseled that these principles "do not establish mechanical rules." *Id.* at 696, 123 S.Ct. 2527. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

### 2. Defense Counsels' Decision Not To Present Dorothy Knisel's Testimony

Simmons claims that his trial counsel provided him with ineffective assistance because they decided not to call Cobaugh's neighbor, Dorothy Knisel, to testify for the defense.[21]

---

**21.** This is Claim VI in the Petition.

### Factual Background

Cobaugh testified that her alleged sexual assault occurred as she was walking home from her neighbor Dorothy Knisel's home. According to Cobaugh, she went to Knisel's home because Knisel called her for assistance with her oxygen tank. (6/3/93 Trial Tr. at 110–11). When she could not assist Knisel, Cobaugh testified, she (Cobaugh) called a local ambulance company. (*Id.* at 112–14). When the ambulance company arrived, Cobaugh explained, she walked home, and during that walk home Simmons attacked her. (*Id.* at 115–17).

Cobaugh testified that she could not remember which ambulance service she called, but she acknowledged that she originally told the police that she called the Seventh Ward Ambulance Association. (*Id.* at 114). To counter Cobaugh's account, the defense presented the testimony of a representative of the Seventh Ward Ambulance Association and five other local ambulance service providers. (6/4/93 Trial Tr. at 6–20). None of these witnesses had any record of responding to Knisel's home or to a call on Figg Street during the time period in question. (*Id.*)

At the 1998 PCRA hearing, defense investigator James Porreca read into the record a signed statement that he had obtained from Knisel during his trial investigation. In the statement, dated May 13, 1993, Knisel attested:

> For the past 6 years I have had to use oxygen for a 24 hour period ... On May 6, 1992, Margaret Cobaugh who lives at 313 Figg Street, Johnstown, Pennsylvania was not at my residence to assist me. Mrs. Cobaugh on May the 6th, 1992, did not call an ambulance to assist me or for the repair of my oxygen tank. Sometime in the past, I told Marge you got yourself involved in something and don't include me in your problem. After I said that Marge said oh, me, it was

> someone else down the street. I have read the above statement which is true and correct to the best of my knowledge. Whenever I have a problem with the oxygen tank, I call ... Walnut Medical Services. I would not call an ambulance company to repair my oxygen.

(3/10/98 Tr. at 190–91). Notwithstanding that Knisel's statement specifically refuted Cobaugh's trial testimony about what occurred on May 6, 1992, Simmons's counsel, Attorneys Filia and Sottile, decided not to call Knisel as a witness for the defense.

Filia and Sottile each testified that, while the defense had subpoenaed Knisel, they subsequently decided not to call her to testify. (3/11/98 Tr. at 116–20, 201, 222). Acknowledging that "it was a very difficult decision," they articulated several reasons that informed their decision. (*Id.*) Filia, who had met with Knisel on at least two different occasions, recalled that Knisel had threatened that "she may change her statement once she got to court." (*Id.* at 202). Both Filia and Sottile testified that Knisel was angered that the defense had subpoenaed her, that she was yelling and uncooperative, and that she even had ripped the subpoena and shoved it down the front of the constable's shirt after he served her with it. (*Id.* at 115–16, 201–02). Although Filia understood that if Knisel's testimony at trial differed from her previous statement, the defense could have impeached her with the statement she had given to Porreca (*id.* at 203), he and Sottile still determined that calling Knisel as a witness was too risky a strategy. (*Id.* at 116–18, 202–03).

Filia had determined that Knisel, who was elderly, frail, and battling health issues, might appear confused on the witness stand and might not do well on cross-examination. (*Id.* at 202–03, 222–23; *see also id.* at 118, 162). He noted that: "After taking everything into consideration,

we felt it would be better that we didn't call her, primarily because she appeared to be a very uncooperative witness and we couldn't be quite sure what she would say on the witness stand." (*Id.* at 223). They also feared that calling a hostile and frail Knisel to the stand might give that jury the impression that the defense was "beating up on yet another old person[.]" (*Id.* at 118). Sottile explained that Cobaugh had passed out in front of the jury after giving her testimony, and he had observed that some jurors had "tears running down their faces" because of that occurrence. (*Id.* at 117).

Because counsel determined that they could not depend on Knisel's competence or effectiveness as a witness, they decided that they would attempt to discredit Cobaugh's testimony by demonstrating that her assertion was unsupported by the records of the local ambulance companies, including the Seventh Ward Ambulance Association. (*Id.* at 117). As Sottile explained:

> [M]y concern was that I didn't want the jury to view us as being so insensitive that after this [Cobaugh fainting] incident we bring this other elderly woman [Knisel] in and she wheels in her oxygen tank, which she had oxygen that she had 24 hours a day apparently, and have her come in unwillingly and maybe go into respiratory arrest on the stand or something like that. So it was a difficult decision. One of the things that we had already done and that we were prepared to do was to have every ambulance service that could have responded to that call testify that in fact they didn't respond to the call. And we knew those people were coming. So knowing that we had those people and then Mr. Filia's opinion that morning that we should not ask the Judge to have the Sheriffs go pick her up to enforce our subpoena and run the risk of having her experience further problems on the witness stand

and that we would hope that the jury would understand even without her testimony that there couldn't have been an ambulance service called there[.]

(*Id.* at 117).

### Legal Analysis

 Simmons challenges his trial counsels' decision, and argues that no reasonable attorney would forego the opportunity to impeach the key prosecution witness out of concern that the she might appear "confused and elderly." We disagree. Considering the "strong presumption that, ... under the circumstances, [trial counsels' actions] might be considered sound trial strategy[,]" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotations and citations omitted), Simmons has failed to prove that his lawyers provided him with constitutionally deficient performance. In so holding, we do not discount the value that Knisel's testimony would have provided to the defense, if, of course, she testified consistent with the statement she had provided to the defense earlier. Her testimony would have lent powerful support for the defense's position that Cobaugh's account simply was unbelievable in a manner that the testimony from the ambulance service representatives could not. However, counsel determined that calling Knisel was too risky. Their decision, based upon Filia's personal observation of Knisel, falls well within the realm of objectively reasonable decision making.

In an effort to discredit Filia's assessment of Knisel, Simmons directs the Court to defense investigator Porreca's description of Knisel as a "very alert" and "very witty[.]" (3/10/98 Tr. at 191). Porreca also testified that Knisel did not appear to be confused when she read and signed the May 13, 1993, statement. (*Id.*) Simmons argues that Porreca's testimony is more credible than Filia's alleged "self-serving testimony," and that this Court should either credit Porreca or hold an evidentiary

hearing for the purpose of determining the credibility of these witnesses.

Simmons's position is untenable. First, he has failed to demonstrate why, under the limitations imposed by the federal habeas corpus laws, he would be entitled to an evidentiary hearing in this Court. 28 U.S.C. § 2254(e)(2). Second, we find no conflict in Filia's and Porreca's PCRA testimony.[22] They visited Knisel together on May 13, 1993, the day that Knisel provided the defense with her signed statement. (3/10/98 Tr. at 189–190; 3/11/98 Tr. at 201). It was at that meeting that Porreca observed Knisel as "very alert," "very witty," and not confused. (*Id.* at 191–92). After that visit, the defense was prepared to call Knisel as a witness. (3/11/98 Tr. at 114). When Filia visited Knisel during the June 1993 trial to serve her with a subpoena, however, Porreca did not accompany him. (3/10/98 Tr. at 192; 3/11/98 Tr. at 114, 201–02). After meeting with Knisel on that date, Filia decided not to call her as a witness, based in part upon his fear that she would become confused while on the stand. (3/11/98 Tr. at 202; *see also id.* at 116–17). Thus, there is no inconsistency between Filia's and Porreca's PCRA testimony. Porreca was describing his assessment of Knisel after having met with her in May 1993, but Filia's impression of Knisel and his decision not to call her as a witness was based upon his June 1993 meeting with her.

### 3. Defense Counsels' Failure to Introduce the Alleged Tacit Admission of Cobaugh That No Sexual Assault Occurred

Simmons next claims that he received ineffective assistance when his counsel failed to present testimony from its two defense investigators that Cobaugh, when confronted with allegations that her claims of sexual assault were false, kept silent.[23]

### Factual Background

In support of this claim, Simmons directs this Court to the PCRA testimony of defense investigators Porreca and Patrick Himes. They testified that, prior to the trial, they went to the senior center in Johnstown to interview Cobaugh. (3/10/98 Tr. at 192; 3/11/98 Tr. at 230). Upon arrival, they spoke to Donald Cobaugh, her husband. During that conversation, Donald Cobaugh asked them what would happen to his wife if it was discovered that she had lied about being sexually assaulted. (*Id.* at 194–95; 3/11/98 Tr. at 230). Margaret Cobaugh then enter the room and began yelling at the investigators to leave the premises. (*Id.* at 196; 3/11/98 Tr. at 231–34). At the same time, Donald Cobaugh started yelling at her to "tell [Porreca] the truth, tell him the truth." (*Id.*) According to both investigators, Margaret Cobaugh did not respond to her husband's directive. She began to scream, and grabbed the back of her husband's wheelchair and pushed him out of the room. (*Id.* at 198; 3/11/98 Tr. at 229–34).

### Legal Analysis

 Simmons contends that Margaret Cobaugh's reaction to her husband's allegation that she had lied about her alleged sexual assault constituted an admission by silence or implied admission under Pennsylvania law. Accordingly, he contends, it was "patently unreasonable" for his counsel to fail to introduce the circumstances of this incident in order to impeach her testimony. (Doc. 17 at 50).

---

**22.** Even if we did, the Court is unpersuaded by the relevance of Porreca's assessment of Knisel. Filia relied upon his own assessment of Knisel's demeanor, and there is nothing objectively unreasonable about that, as he, and not Porreca, possessed the legal skills and experience to determine whether or not to present the testimony of a witness.

**23.** This is Claim VII in the Petition.

Simmons's claim fails for several reasons. First, the PCRA court determined that Cobaugh's silence would not have been admissible under Pennsylvania law, and this Court is bound by its decision on state law. *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir.2004). Second, even if this Court were not so bound, we would reach the same conclusion. Pennsylvania law provides that the "failure of a party to reply to a statement made in his presence or hearing is significant where the nature of the statement, and the circumstances under which it was made are such as to render a reply natural and proper.... Silence is considered an admission, only when the circumstances are such that one ought to speak and does not." *Levin v. VanHorn*, 412 Pa. 322, 194 A.2d 419, 421 (1963) (internal citations and quotations omitted). Simmons has failed to demonstrate that a reply from Margaret Cobaugh was a natural and proper response under the circumstances. At the PCRA hearing, Cobaugh testified that she did not hear her husband. (3/11/98 Tr. at 245). In addition, by that date in the trial preparations, Cobaugh had decided that she would no longer speak to the defense investigators. (*Id.* at 233, 239, 194 A.2d 419). Moreover, the PCRA testimony established that Cobaugh was clearly agitated by the defense investigators' presence and that she and her husband were screaming at each other and at the defense investigators. (3/10/98 Tr. at 196–97; 3/11/98 Tr. at 230–34, 239).

Third, and finally, Simmons did not develop any testimony at the PCRA hearing regarding why his counsel did not seek to introduce Cobaugh's alleged tacit admission at trial. He has not directed this Court to any testimony regarding his counsels' bases for the decision at issue, let alone to testimony establishing that the decision was unreasonable. Under *Strickland*, it is the petitioner who has the burden to prove all facts in support of his claim. *Sistrunk v. Vaughn*, 96 F.3d 666, 671 (3d Cir.1996).

## C. Conclusion

Simmons is not entitled to habeas relief on either of his guilt-phase ineffective assistance of counsel claims. Because he has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court will also deny him a certificate of appealability on these claims.

## IV. CONCLUSION

Ernest Simmons has demonstrated that the prosecution denied him a fair trial by concealing evidence from the defense that raises serious questions concerning the credibility of the two key witnesses who formed the foundation of the prosecution's case as well as physical evidence that would have further buttressed his claim of innocence. These failures were neither inadvertent nor isolated. Rather, the evidence reveals that the prosecution was well aware of its obligation to disclose and yet engaged in a deliberate pattern of concealment. Viewed cumulatively, as we must, this conduct produced a verdict that is fundamentally unworthy of confidence. As a result, Simmons is entitled to habeas relief. Within 120 days of the entry of the following Order, the Commonwealth may conduct a new trial. If the Commonwealth chooses not to conduct a new trial, it shall release Simmons on his conviction for first-degree murder and robbery.

## *ORDER*

AND NOW this 22nd day of February, 2005, upon consideration of the Petition for Writ of Habeas Corpus (doc. 10), and the complete record in this case, it is hereby ORDERED and DIRECTED that:

1. Petitioner's request for habeas corpus relief on his convictions and sentences

for first-degree murder and robbery is GRANTED;

2. A certificate of appealability is DENIED with respect to Claims II, VI, and VII.

3. The execution of the writ of habeas corpus is STAYED for 120 days from the date of this Order, during which time the Commonwealth of Pennsylvania may conduct a new trial;

4. After 120 days, should the Commonwealth of Pennsylvania not conduct a new trial, the writ shall issue and the Commonwealth shall release petitioner on his conviction for first-degree murder and robbery;

5. In accordance with 28 U.S.C. § 2253(c)(2) and W.D. Pa. Local R. 9.4(L), a certificate of appealability is DENIED in all other respects consistent with the foregoing Memorandum Opinion;

6. If either party files an appeal to the United States Court of Appeals for the Third Circuit, this Order will be stayed pursuant to W.D. Pa. Local R. 9.4(L);

7. The Clerk of Court shall mark this CASE CLOSED.